IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEPHEN JAMES DREVAS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : Civil Action No. 1:15-194-RGA | |
| | : | |
| CAROLYN COLVIN, Acting | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## **MEMORANDUM OPINION**

Oderah C. Nwaeze, Esq., Duane Morris LLP, Wilmington, DE; Eddy Pierre Pierre, Esq., Law Offices of Harry J. Binder and Charles E. Binder, P.C., New York, NY, Attorneys for Plaintiff.

Nora Koch, Acting Regional Chief Counsel Social Security Administration, Office of the General Counsel, Philadelphia, PA; Jillian Quick, Assistant Regional Counsel, Office of the General Counsel, Philadelphia, PA; Charles M. Oberly, III, United States Attorney, Office of the General Counsel, Philadelphia, PA; Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, PA, Attorneys for Defendant.

November 25, 2015

ANDREWS, U.S. District Judge:

Plaintiff, Stephen James Drevas, appeals the decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying his application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Title II and Title XVI, respectively, of the Social Security Act (the "Act"). 42 U.S.C. §§ 401-434, 1381-1383f. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Presently pending before the Court are cross-motions for summary judgment filed by Drevas and the Commissioner. (D.I. 10, 12). For the reasons set forth below, the Court denies Drevas's motion for summary judgment and grants the Commissioner's motion for summary judgment.

## I.    BACKGROUND

### A. Procedural History

Drevas filed an application for DIB on January 26, 2010, and SSI[1] on February 16, 2010, alleging disability as of January 28, 2009 due to a slip and fall on ice. (D.I. 8 (hereinafter "Tr.") at 145-53). Drevas's applications were initially denied on August 13, 2010 (Tr. at 86-90) and were again denied upon reconsideration on August 2, 2011 (Tr. at 92-97). Thereafter, a hearing took place per Drevas's request before an Administrative Law Judge (the "ALJ") on October 18, 2012. (Tr. at 39-79). The ALJ issued a partially favorable decision on April 26, 2013, finding Drevas was disabled from January 28, 2009 to October 2, 2011, but his disability ended as of October 3, 2011. (Tr. at 17-38). Drevas sought review by the Appeals Council (Tr. at 16), but his request was denied on December 30, 2014, making the ALJ's decision the final decision of

---

[1] Eligibility for SSI is derivative of qualification for DIB. For ease of reference, the Court will refer only to DIB.

2

the Commissioner. (Tr. at 1-5). On February 27, 2015, Drevas filed the current action for review of the final decision. (D.I. 1).

### B. Plaintiff's Medical History, Condition, and Treatment

#### i. *Medical Evidence*

At the onset of his disability, Drevas was thirty-nine years old and possessed a ninth grade education. (Tr. at 45). Drevas has relevant work experience as a driller, insulation worker, and supervisor of drilling. (Tr. at 73). Drevas's detailed medical history is contained in the record, but the Court will provide a brief summary of the pertinent evidence. The period of disability in dispute is from October 3, 2011 to the present; all parties agree that Drevas was disabled from January 28, 2009 to October 2, 2011.

Subsequent to slipping and falling on ice while at work, Drevas visited the emergency room for back pain on January 30, 2009, and February 5, 2009. (Tr. at 314-39). As a result of the fall, Drevas had disc herniation at L4-L5 that caused "significant root compression." (Tr. at 340). For approximately one year, Drevas experienced persistent back and left leg pain, leading him to visit Dr. Pawan Rastogi on November 17, 2009. (Tr. at 373). Dr. Rastogi diagnosed Drevas with significant left lumbar radiculopathy that failed to improve with conservative treatment and recommended that he undergo a microdiscectomy. *Id.*

On December 7, 2009, Drevas underwent the recommended back surgery. (Tr. at 340-42, 357-58). However, the pain persisted, and Drevas reported on March 2, 2010 that he had leg pain, numbness, and tenderness with a diminished range of motion following his surgery. (Tr. at 348). Dr. Rastogi noted that Drevas's pain had "really not resolved after his microdiscectomy" and decided to wait and see if the nerve would heal. *Id.*

3

On April 20, 2010, Dr. Rastogi found that despite participating in physical therapy and receiving injections, Drevas was still experiencing persistent left leg and lower back pain. (Tr. at 694). Dr. Rastogi recommended another surgery involving a facetectomy and fusion. *Id.* Drevas accepted the advice and underwent a second surgery on his lower back on May 24, 2010. (Tr. at 694, 552-53). The intraoperative findings of this surgery included "[a] large recurrent disc herniation with significant root compression[.]" (Tr. at 552).

Throughout the next five months of follow-up visits with Dr. Rastogi, Drevas complained of pain. (Tr. at 544-46, 548). On June 22, 2010, Drevas reported new pain in his right buttock that radiated down his right thigh. (Tr. at 546). On August 24, 2010, Drevas stated that therapy had not helped his significant back pain accompanied by intermittent pain down his leg. (Tr. at 545). Testing on August 28, 2010 revealed moderate edema and post-operative changes in the L4-L5 disc space. (Tr. at 550). An MRI on September 24, 2010, reflected mild left epidural fibrosis and a partial laminectomy defect at the L4-L5 disc space. (Tr. at 548). On November 16, 2010 Dr. Rastogi found that Drevas was "slowly improving[,]" but had a tender back with diminished range of motion. (Tr. at 544). Drevas again reported intermittent back and leg pain. *Id.*

In December 2010, an orthopedic specialist, Dr. Kamali, evaluated Drevas for hip and back pain and found his clinical exam was "essentially within normal limits and [his] radiological exam also was normal." (Tr. at 547). However, Dr. Kamali did find that Drevas slightly favored his left leg when walking and straight leg raising was positive on the left to 65 degrees. *Id.* Believing no further surgery was necessary because Drevas had "surgical intervention with no benefit[,]" Dr. Kamali referred Drevas back to Dr. Rastogi. *Id.*

Drevas began seeing internist Dr. Irwin Lifrak on January 5, 2010 for moderate to severe lower back pain, without pain down either leg, that began again two weeks prior to the visit. (Tr. at 556). Dr. Lifrak diagnosed acute muscle spasm and muscle sprain/strain and prescribed pain medication and an exercise program. *Id.* At a follow-up appointment on February 8, 2010, Drevas reported intensified pain in numerous joints. (Tr. at 555). Lifrak diagnosed degenerative joint disease and prescribed pain medication and physical therapy. *Id.*

Drevas underwent a third and final surgery after an MRI on July 7, 2011 revealed changes in his lower back including minimal disc protrusion at L4-L5 and bilateral disc protrusion at L3-L4. (Tr. at 593, 603-606, 615). On August 22, 2011, Dr. Fras performed a revision of Drevas's lumbar fusion at L4-L5. (Tr. at 593, 603-606). Dr. Fras noted in his discharge summary that Drevas's "pain was well controlled[,]" and he was neurologically intact and stable. (Tr. at 593). Post-operative spine x-rays taken between October 3, 2011 and December 12, 2011 revealed that Drevas's fusion was intact and reflected stable post-operative changes at L4-L5. (Tr. at 608, 610-11).

Dr. Fras wrote on a prescription pad for Drevas on December 7, 2011 that Drevas would be "unable to work for at least a full year because of chronic back and radicular leg pain." (Tr. at 589). Dr. Fras referred Drevas to pain specialist Dr. Kapur. (Tr. at 724).

On February 2, 2012, Drevas stated to Dr. Kapur that "his back pain [was] much better[.]" *Id.* Drevas complained of leg pain of four to seven on a scale of one to ten, which he was coping with by taking ibuprofen, but denied weakness in the extremity. *Id.* Dr. Kapur's physical examination failed to reveal any muscle spasm or tenderness over Drevas's lower back joints, but did reflect a positive straight leg raising on the left. *Id.* However, Drevas's sensation was intact, and he had full strength in his extremities. *Id.* Diagnostic testing one week later on

February 9, 2012, reflected stable post-operative appearance at the L4-L5 disc space. (Tr. at 607).

Between February 16, 2012 and March 12, 2012, Drevas continued to experience pain in his legs despite the pain medication prescribed by Dr. Kapur. (Tr. at 719-23). Dr. Kapur recommended epidural steroid injections in Drevas's spine and stated she was considering Drevas for participating in her spinal cord stimulator trial. (Tr. at 719-20). On March 12, 2012, Dr. Kapur administered the lower back injection, and Drevas experienced three to five days of pain relief. (Tr. 719, 721).

Dr. Fras saw Drevas again in May of 2012 as Drevas reported that he had been "discharged from Dr. Kapur's pain management practice" because he tested positively for marijuana and PCP. (Tr. at 736). Drevas stated that he had not experienced much improvement with injections or physical therapy, but rated his pain as moderate, or six on a scale of one to ten. *Id.* Drevas stated there was no pain running completely down his leg, and he was not experiencing any tingling, numbness, or weakness. *Id.* Dr. Fras's physical exam revealed a solid fusion, negative straight leg raising tests, normal gait, full muscle strength and sensation, and a lack of any tenderness over joints. *Id.* Drevas refused Dr. Fras's recommendations to pursue physical therapy and to employ another pain management specialist. *Id.*

The ALJ requested a physical consultative evaluation post-hearing, and on November 9, 2012, Dr. Fink completed a one-time physical examination of Drevas. (Tr. at 771-82). Dr. Fink found that Drevas's memory was intact, as well as his lower and upper extremity strength. (Tr. at 773). Additionally, Drevas had no sensory loss or ataxia of his limbs, gait, or trunk. *Id.* Dr. Fink concluded that Drevas had two medical limitations: severe, lower back pain and pain down the left leg, and significant muscle spasm in the left paraspinal muscle area. *Id.* In an eight hour

6

work day, Dr. Fink felt that Drevas could only walk for one of the hours and stand for one-half of an hour. (Tr. at 778).

### i. *Mental Health Evidence*

In July and August 2010, Drevas was hospitalized due to suicidal ideation subsequent to his fall in January of 2009. (Tr. at 520-27). Upon Drevas's first visit to the hospital on July 27, 2010, he was diagnosed with major depression and chronic pain syndrome. (Tr. at 525). At Drevas's second visit to the hospital on August 24, 2010, he was diagnosed with bipolar affective disorder, depressed phase, opiate dependence, and chronic pain. (Tr. at 524). At the time of Drevas's discharge from hospital stays, his Global Assessment of Functioning ("GAF") was 50 and 30, respectively. (Tr. at 523). During both says, his affect was described as anhedonic, flat, blunted, and restricted. (Tr. 521, 525).

Drevas began treatment with Dr. Patricia Lifrak one month later and continued seeing Dr. Lifrak until September 24, 2012. (Tr. at 766-68). At Drevas's first visit on September 30, 2010, Dr. Lifrak described his mood and affect as depressed and anxious, and she diagnosed Drevas with mood disorder and depression. *Id.* Dr. Lifrak also noted that Drevas was suffering from decreased short and long term memory, decreased concentration, angry outbursts, difficulty sleeping and social withdrawal. *Id.* Dr. Lifrak found that Drevas's GAF was 60 at that time. (Tr. at 768).

Starting April 12, 2011, Drevas started to show improvement in his mental state, albeit experiencing some documented ups and downs. (Tr. 751-65). On April 12, 2011, Dr. Lifrak noted that Drevas "denie[d] depression" and noted that his mood and appetite had improved. (Tr. at 761). On July 11, 2011 and July 18, 2011, Drevas was "doing well[,]" and was less depressed, denying manic symptoms, and getting better sleep. (Tr. at 758-59). After his third

and final surgery, Drevas's improvement waned as Dr. Lifrak noted that he recently had back surgery and "[felt] down sometimes" about his pain and how he could not work. (Tr. at 757). Between January 13, 2012 and September 24, 2012, Dr. Lifrak noted that Drevas was still depressed, but less so than before. (Tr. at 751-55). At his last visit with Dr. Lifrak, Drevas was "doing better still depressed but less than before. Mood is stable. . . . Sleep is good." (Tr. at 751).

Drevas also received treatment from psychologist Dr. Silberman between December 23, 2011 and January 24, 2012. (Tr. at 728-34). On December 23, 2011, Dr. Silberman noted that Drevas had been "chronically depressed as a result of major depressive disorder." (Tr. at 732). At his last visit with Dr. Silberman, Drevas, while still depressed and crying easily, appeared less depressed, with clear, goal-directed speech. (Tr. at 728).

The ALJ requested a mental consultative evaluation post-hearing, and four months after Dr. Fink's physical consultative evaluation, on March 18, 2013, Dr. Kurz completed a one-time mental health evaluation of Drevas. (Tr. at 783-91). Dr. Kurz noted that Drevas stated that "the chronic pain[,]" and not emotional or psychological issues, "was the primary reason that he was unable to work" but "there was no evidence that pain affected his performance during this evaluation." (Tr. at 786). Further, Dr. Kurz found that Drevas exhibited no indications of depression or anxiey and at no time was he teary. (Tr. at 785). Further, Drevas's eyes were clear, his gait steady, and his cognitive skills, including working and long-term memory, were also intact. (Tr. at 785-86). Dr. Kurz diagnosed Drevas with depression and generalized anxiety disorder, but found that the estimated degree of impairment from these disorders ranged from moderate to none. (Tr. at 787-90). Dr. Kurz stated that Drevas's GAF was 63 at the time of the evaluation. (Tr. at 786).

## C. ALJ Decision

In his April 26, 2013 decision, the ALJ found that Drevas had the severe impairments of history of back trauma, status post three back surgeries, depression, anxiety, and history of substance abuse, currently in remission. (Tr. at 25). The ALJ also found that from January 28, 2009 through October 2, 2011, Drevas had the residual functional capacity ("RFC") to perform sedentary work, except that due to pain, depression and the need for multiple back surgeries, Drevas "would have had limited productivity and reliability so that he was off task 20% or more of the workday." (Tr. at 26). Thus, a vocational expert testified that, after considering Drevas's age, education, work experience, and RFC, Drevas was unable to perform any work existing in the national economy in significant numbers from January 28, 2009 through October 2, 2011. (Tr. at 29-30).

As of October 3, 2011, the ALJ determined that Drevas did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 32). Further, the ALJ concluded that Drevas experienced medical improvement beginning October 3, 2011. *Id.* The ALJ relied upon the evidence that Drevas had no additional surgeries scheduled, his fusion was solid, and there were no neurological abnormalities. *Id.* Additionally, the ALJ found that Drevas reported significant relief in low back pain, and Dr. Patricia Lifrak and Dr. Silberman both had progress notes documenting Drevas's "improvement in his depressive symptoms with medication and treatment." (Tr. at 33).

The ALJ found that this medical improvement increased Drevas's RFC and, ultimately, ended Drevas's disability. In determining Drevas's RFC, the ALJ found his testimony regarding the intensity, limiting effects, and persistence of his symptoms to be not entirely credible. (Tr. at

34). Thus, the ALJ opined that Drevas had the RFC to perform sedentary work, except that any jobs would consist of simple, routine tasks and could be performed in either a sitting or standing position. (Tr. at 33). Therefore, the ALJ concluded that Drevas's disability ended October 3, 2011, as there were jobs that exist in significant numbers in the national economy that Drevas could perform. (Tr. at 36-37).

## II. LEGAL STANDARD

### A. Standard of Review

This Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence." *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence (does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v, Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2011). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at \*3 (E.D. Pa. July 11, 2001) (citations omitted).

The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. evidence offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 143 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## B. Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). To qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if [the individual's] physical or mental impairment or impairments are of such severity" that the individual is precluded from performing previous work or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 520 U.S. 20, 21-22 (2003).

To determine whether an individual is disabled, the Commissioner must employ a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

11

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *Id.* If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not suffering from a severe impairment or a combination of impairments that is severe, the claimant is not disabled. *Id.*

If the claimant's impairments are severe, step three requires the Commissioner to compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments or impairment combination are not listed or medically equivalent to any listing, then the analysis continues to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 131 (3d Cir. 2000)). "The claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to his or her past relevant work, the claimant is not disabled. *See id.*

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the impairments preclude the claimant from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating "not disabled" finding if claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits.[2] *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the Commissioner must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the assistance of a vocational expert is often sought. *See id.*

## III. DISCUSSION

Drevas makes three primary objections. (D.I. 11 at 2). First, Drevas argues that the ALJ failed to properly weigh the medical evidence and erred in finding that Drevas experienced medical improvement. *Id.* Second, Drevas contends that the ALJ failed to properly evaluate his credibility. *Id.* Third, Drevas argues that the ALJ relied on flawed vocational expert testimony. *Id.* After reviewing the decision of the ALJ in the light of the relevant standard of review and applicable legal principles, this Court finds that the ALJ's decision is supported by substantial evidence for the reasons discussed below.

### A. ALJ's Weighing of Medical Evidence and Finding of Medical Improvement

Drevas argues that the ALJ erred in discrediting the opinions of treating physician Dr. Fras and consultative examiner Dr. Fink and finding that Drevas experienced medical

---

[2] The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).

improvement as of October 3, 2011. *Id.* at 13-14. This Court finds that the ALJ properly considered the opinions and medical evidence contained in the record in order to conclude Drevas experienced medical improvement.

The ALJ is required to weigh all of the evidence in the medical record to resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) (clarifying that when the record contains conflicting medical evidence, it is the ALJ's duty to weigh that evidence and resolve the conflict); *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (discussing when "there [is] record evidence from a treating [physician] suggesting a contrary conclusion, the ALJ is entitled to weigh all evidence in making its finding"); *Fargnoli*, 247 F.3d at 43 (citations omitted) (explaining that ALJ may weigh credibility of the evidence); 20 C.F.R. § 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."). While the ALJ is instructed to generally give controlling weight to treating physician opinions, the ALJ can discount a treating physician's opinion if it is not consistent "with the other substantial evidence in [the claimant's] record." 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2); *see also Fargnoli*, 247 F.3d at 42. However, the ALJ must "give good reasons" for discounting medical evidence in the record. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2); *Fargnoli*, 247 F.3d at 43 ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence."). Additionally, "[a]lthough a treating physician's opinion is entitled to great weight, a treating physician's statement that a plaintiff is unable to work or is disabled is not dispositive." *Perry v. Astrue*, 515 F. Supp. 2d 453, 462 (D. Del. 2007).

When an ALJ deems an opinion unworthy of controlling weight, the ALJ must then evaluate the weight to give to the opinion according to specific factors.[3] *See* 20 C.F.R. § 404.1527(c)(1)-(6), 416.927(c)(1)-(6); *Gonzales v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del 2008) ("Even where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion."). The ALJ's determination must be clear enough to allow a reviewing court to determine what weight was given to an opinion and the reasons for that weight determination. SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (clarifying that "the notice of the determination or decision . . . must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight").

In the present case, the ALJ adequately explained why certain portions of the medical evidence were rejected or given less weight in accordance with the applicable law described above. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Drevas contends that the ALJ improperly discredited the December 7, 2011 opinion written on a prescription pad by Dr. Fras, his treating physician, that Drevas was "unable to work for at least a full year because of chronic back and radicular leg pain." (D.I. 11 at 15-16); (Tr. 36, 589). Further, Drevas argues that the ALJ failed to indicate what weight was given to Dr. Fras's opinion, as well as reasons for that weight. (D.I. 11 at 16).

---

[3] The six factors the ALJ must consider are: (1) whether there is an examining relationship; (2) the treatment relationship, including the length and nature of the relationship; (3) supportability of the opinion, as in the better the explanation offered for an opinion, the more weight will be given to the opinion; (4) consistency, meaning more weight is given to opinions that are consistent with the medical record as a whole; (5) specialization; and (6) other factors. *See* 20 C.F.R. § 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

This Court finds that it is clear from the ALJ's determination what weight was given to Dr. Fras's finding of Drevas's inability to work until at least December 7, 2012, and the ALJ explicitly listed reasons for discrediting Dr. Fras's opinion. (Tr. at 35-36). The ALJ recognized that Dr. Fras was a treating source, but did "not give his opinion controlling weight" as it was not supported by medical signs and laboratory findings, conflicted with treatment records, and was not supported by the medical evidence or consistent with the record as a whole. *Id.* Ultimately, the ALJ found that Drevas was no longer disabled as of October 3, 2011, which rejects Dr. Fras's opinion that Drevas could not work until at least December 7, 2012. *Id.* The ALJ listed specific evidence from the record which was in direct conflict with Dr. Fras's opinion regarding when Drevas could work.[4] Thus, it is clear to this Court that the ALJ gave little or no weight to Dr. Fras's opinion. The ALJ did not have to take Dr. Fras's opinion as to when Drevas would be able to work as dispositive, because that decision is reserved to the Commissioner. *See Perry*, 515 F. Supp. 2d at 462.

Drevas also argues that the ALJ erred in discrediting consultative examiner, Dr. Fink, because the ALJ did not give any appropriate reason for according "little weight" to Dr. Fink's opinions. (D.I. 11 at 16-17). Yet, the ALJ applied the requisite factors in determining how much weight to give Dr. Fink's opinion and gave "good reasons" for the weight determination as required by the regulations. (Tr. at 36); *see* 20 C.F.R. § 404.1527 ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). The ALJ found that Dr. Fink's opinion was inconsistent with the medical record as a whole and listed specific evidence of such. *Id.* Specifically, the ALJ found Dr. Fink's opinion

---

[4] Specifically, the ALJ found that "[o]bjective studies have demonstrated a solid fusion. The claimant has not required any further surgeries. The record shows that the claimant has been discharged from pain management due to non-compliance and he informed Dr. Fras that he has not yet contacted another pain management specialist." (Tr. at 36).

16

was in conflict with the record's reflection of Drevas's improvement in "lumbar spine pain following the third and final revision surgery and the benign findings on physical examinations since October 3, 2011." *Id.* The ALJ also explicitly considered the short length of Dr. Fink's treatment relationship. *Id.* Thus, this Court finds that the ALJ correctly applied the law in discrediting Dr. Fink's opinion.

Finally, Drevas contends that the ALJ erred in finding that he experienced medical improvement. (Tr. at 14-15). In making a finding of medical improvement, the ALJ must determine if there has been any improvement in the claimant's impairments and then assess whether the improvement is related to the claimant's ability to work. *See* 20 C.F.R. § 404.1594(a); 416.994(a). Medical improvement is defined as any "decrease in the medical severity" of a claimant's impairment(s) and "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [a claimant's] impairment(s)." 20 C.F.R. § 404.1594(b)(i), 416.994(b)(i).

The ALJ summarized medical evidence, including diagnostic testing and clinical findings, that showed Drevas experienced improvement.[5] The ALJ then went on to state that the medical improvement was related to Drevas's ability to work, because it resulted in an increase in his residual functional capacity. (Tr. at 33-35). Thus, this Court finds that the ALJ applied the appropriate law in finding medical improvement and weighing the medical evidence such that substantial evidence supports the ALJ's conclusion.

---

[5] The ALJ found that the record showed Drevas experienced improvement in his back and with his depression. (Tr. at 31-33). As for Drevas's back, the ALJ noted that he "ha[d] not had any further surgeries since August 2011 and no surgeries ha[d] been scheduled." *Id.* at 32. "Objective studies subsequent to [Drevas's] final revision surgery on his back in August 2011 document[ed] that the fusion [was] solid[,]" Drevas "reported significant relief in low back pain[,]" and "there were no neurological abnormalities." *Id.* Mentally, the ALJ summarized that "[p]rogress notes from Dr. [Patricia] Lifrak and Allen Silberman, Ed.D., document[ed] that [Drevas] . . . experienced improvement in his depressive symptoms with medications and treatment[.]" *Id.* at 33.

17

Here, the ALJ applied the correct law and provided detailed explanations of his reasons for discrediting medical opinions, weighing the evidence, and finding medical improvement. According to the relevant standard of review, this Court cannot undertake a re-weighing of the evidence. The Court therefore rejects Drevas's arguments regarding the ALJ's supposed errors in weighing medical evidence and finding medical improvement.

### B. Drevas's Credibility

Drevas contends that the ALJ erred in evaluating his credibility. (D.I. 11 at 18). Specifically, Drevas argues that the ALJ's determination that Drevas's statements were "not entirely credible" was boilerplate language that provides no explanation for why Drevas's testimony about his symptoms were discredited. *Id.* at 19.

In evaluating a claimant's credibility, the ALJ must follow a two-step process. *See* 20 C.F.R. § 404.1529. First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment(s). . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* Specifically, the ALJ's determination must reflect "specific reasons for the finding on credibility, supported by the evidence in the case record," and must make clear to subsequent reviewers the weight given to the individual's statements. *Id.* at *4.

Here, the ALJ applied the requisite two-step credibility procedure. (Tr. at 33-36). The ALJ found that Drevas's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [Drevas's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons

18

explained in the decision." *Id.* at 34. The ALJ then extensively discussed the medical record to give reasons for discrediting Drevas's credibility. *Id.* at 34-36. Finding that Drevas's statements about the preclusive nature of his symptoms were inconsistent with other evidence in his medical record, the ALJ determined that he was "not entirely credible."[6] *Id.* It is clear to this subsequent reviewing Court what weight was given to Drevas's statements through the ALJ's discussion of the relevant medical evidence as contrasted with Drevas's opinions about the preclusive nature of his pain.[7] There was boilerplate. More importantly, though, there was also analysis specific to Drevas. Thus, after examining the ALJ's decision with respect to the relevant standard of review, this Court finds the ALJ appropriately evaluated Drevas's credibility.

### C. Vocational Expert Testimony

Drevas argues that the ALJ failed to accurately describe Drevas's mental limitations to the vocational expert in his hypothetical. (D.I. 11 at 20). Specifically, Drevas argues that the ALJ did not convey Drevas's moderate difficulties with concentration, persistence, or pace to the vocational expert, and instead only limited Drevas to simple, routine tasks. *Id.*

In steps four and five of a disability determination, "a vocational expert . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as

---

[6] Evidence of this includes Drevas's testimony 'that he lay in bed "[a]ll day long,' [but] he had no atrophy and full strength in his legs . . .; he admitted improvement in his back following his last surgery, which successfully remained fused . . .; [and] during a psychological examination in March 2013, [Drevas] displayed 'no evidence that pain affected his performance[.]'" (D.I. 13 at 17).

[7] For instance, Drevas's testified that his pain required him to lie in bed all day, but the ALJ limited Drevas to sedentary work. (Tr. at 33, 37). Additionally, the ALJ is not required to use any particular language in conveying to any subsequent reviewing court what weight was given to the claimant's statements; the weight given is only required to be clear to the reviewing court. *See Wright v. Comm'r of Soc. Sec.*, 386 F. App'x 105, 109 (3d Cir. 2010) (affirming that the claimant's statements were "not entirely credible" because "the record lack[ed] objective medical evidence supporting [the claimant's] subjective complaints" and therefore "substantial evidence in the record support[ed] the ALJ's credibility assessment").

generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). "[T]he ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*" in order to rely upon the vocational expert's testimony as substantial evidence. *Rutherford*, 399 F.3d at 554 (citing *Plummer*, 186 F.3d at 431). The ALJ is free to reject limitations "if there is conflicting evidence in the record." *Id.* The purpose of posing a hypothetical is to determine whether a claimant has the residual functional capacity to perform either the claimant's previous work or any work that exists in the national economy.[8] *Ramirez v. Barnhart*, 372 F.3d 546, 549 (3d Cir. 2004) (explaining that purpose of hypothetical is to determine whether the claimant had a residual functional capacity to perform any work in the national economy).

Limitations in broad functional areas are used at a number of steps in the disability determination process for different reasons. *See* SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996) (explaining "the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process"); *Ramirez*, 372 F.3d at 555 (explaining that while limitations in broad functional area "findings are 'not an RFC assessment' and that step four requires a 'more detailed assessment,'" these limitations still play a role in steps four and five). At steps two and three, limitations in broad functional areas are used to determine the severity of a claimant's mental impairment. *See* SSR 96-8p, 1996 WL 374184, at *4. In the work capacity assessment at steps four and five, these limitations need to be accounted for through specific physical functions that adequately convey what a claimant is able to do at work. 20 C.F.R. §

---

[8] The residual functional capacity of a claimant is what the ALJ will use to determine if the claimant can adjust to any work that exists in the national economy and is defined as the most a claimant can <u>do</u> despite his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); 20 C.F.R. § 404.1560(c)(1) ("We will look at your ability to adjust to other work by considering your residual functional capacity and the vocational factors of age, education, and work experience[.]" ).

404.1545(c), 416.945(c) (describing process by which an ALJ "first assess[es] the nature and extent of [claimant's] mental limitations and restrictions and then determine[s] [claimant's] residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work."). However, the regulations do not require the exact language of a claimant's limitations in broad functional areas to be explicitly stated in a work capacity assessment. *Id.*

Drevas cites *Ramirez v. Barnhart* as controlling Third Circuit precedent with respect to whether a hypothetical in which a claimant is limited to simple, routine tasks adequately conveys that claimant's moderate difficulties with concentration, persistence, or pace. (D.I. 11 at 20); *see Ramirez*, 372 F.3d at 554. The Third Circuit held in *Ramirez* that an ALJ's hypothetical limiting a claimant that *often* suffered from deficiencies in concentration, persistence, or pace to simple one or two-step tasks failed to adequately convey that claimant's limitations. *Ramirez*, 372 F.3d at 554. Drevas concedes that "[s]ince *Ramirez* was decided, the Commissioner replaced the term 'often' with 'moderate.'" (D.I. 11 at 20). The language used in the present case is different from *Ramirez*, as "moderate" does not have the same meaning as "often." Consequently, *Ramirez* is not controlling in the case at hand. *See McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008) (accepting an ALJ's hypothetical when the ALJ made a "finding that [claimant] only had 'moderate limitations with his ability to maintain concentration, persistence, and pace,' [and] the ALJ included in her hypothetical that the individual be limited to 'simple, routine tasks'"); *Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) ("Having previously acknowledged that [claimant] suffered moderate limitations in concentration, persistence and

pace, the ALJ also accounted for these mental limitations in the hypothetical question by restricting the type of work to 'simple routine tasks.'"); *Steppi v. Colvin*, No. CV 10-954-SLR (SRF), 2014 WL 794573, at *13 (D. Del. Feb. 27, 2014), *report and recommendation adopted*, No. CV 10-954-SLR (SRF), 2014 WL 1339071 (D. Del. Mar. 31, 2014) ("The Third Circuit has explained that when the ALJ limits a claimant's employment to simple or routine work, it accounts for the claimant's moderate limitations in concentration, persistence, and pace.").

Here, the ALJ accounted for Drevas's broad functional limitations in concentration, persistence, or pace by limiting Drevas to "simple, routine tasks." (Tr. at 31, 36-37). Drevas has not asserted any further mental limitations that would preclude him from such work, and evidence supports the ALJ's limitation to simple, routine tasks. For instance, the Commissioner highlights that "by October 2011, [Drevas] required only conservative psychiatric treatment; he reported that medication was helping with depressive symptoms[,]" "his cognitive skills were intact[,]" "and a psychological examiner found no evidence of mood, thought, or personality disorder and thus assessed only mild symptoms[.]" (D.I. 13 at 19). Additionally, "[n]o medical source identified any work-preclusive mental limitations." *Id.* Thus, as Drevas's limitations in concentration, persistence, or pace were adequately conveyed by limiting him to simple, routine tasks, the ALJ did not present a flawed hypothetical to the vocational expert. Consequently, the ALJ was justified in relying on the vocational expert's testimony as substantial evidence.

## IV. CONCLUSION

For the reasons discussed above, Drevas's motion for summary judgment (D.I. 11) is denied, and the Commissioner's cross-motion for summary judgment (D.I. 13) is granted.

A separate order will be entered.